UNITED STATES DISTRICT COURT PRESKA
SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

     Plaintiff,

     v.

OPTIVER US, LLC, OPTIVER HOLDING BV,
OPTIVER VOF, CHRISTOPHER DOWSON,
BASTIAAN VAN KEMPEN, AND RANDAL MEIJER

     Defendants.

'08 CIV 6560

Case No. _____

COMPLAINT FOR INJUNCTIVE
AND OTHER EQUITABLE
RELIEF AND CIVIL MONETARY
PENALTIES UNDER THE
COMMODITY EXCHANGE ACT



Jury Trial Demanded

By and for its complaint, the U.S. Commodity Futures Trading Commission ("CFTC")

alleges as follows:

## I.
## SUMMARY OF DEFENDANTS' MANIPULATION OF THE ENERGY MARKETS AND VIOLATIONS OF THE COMMODITY EXCHANGE ACT

1. In early 2007, Defendants Optiver US, LLC ("Optiver"), Optiver Holding BV

("Optiver Holding"), and Optiver VOF ("Optiver VOF") – the U.S. and Netherlands branches of

a global proprietary trading fund headquartered in the Netherlands – developed and, in March

2007, implemented a scheme to manipulate the price of futures contracts in Light Sweet Crude

Oil, New York Harbor Heating Oil, and New York Harbor Gasoline on the New York

Mercantile Exchange ("NYMEX").

2. On at least 19 separate instances during the month of March 2007, Optiver,

Optiver Holding, and Optiver VOF, led by head traders, Defendant Christopher Dowson

("Dowson") and Defendant Randal Meijer ("Meijer"), repeatedly attempted to manipulate

market prices – or in Dowson's own words, "bully the market" – for the above-referenced energy

futures contracts towards the end of the trading day. The manipulative strategy employed by Defendants Optiver, Optiver Holding, Optiver VOF, Dowson, Meijer and Bastiaan Van Kempen (together, either acting directly or in their capacity as controlling persons or principals liable for the acts of their agents as described more specifically below, "Defendants") is commonly known as "banging the close" or "marking the close."

3.    On at least five of the nineteen instances, Defendants succeeded in their manipulative scheme by causing artificial prices in certain of these energy futures contracts, resulting in serious harm to other market participants and, ultimately, to the public at large.

4.    The Defendants' scheme involved trading a large volume of Crude Oil, Heating Oil, and New York Harbor Gasoline futures contracts to manipulate the futures prices for these contracts, including the settlement price which is based on the volume weighted average price (the "VWAP") of trades during the two minutes prior to the 2:30 PM closing bell (the "Close").

5.    Defendants developed a scheme by which Optiver, having accumulated a large net TAS (defined below) position, traded a significant volume of futures contracts in the opposite direction, before and during the Close, with the goal to improperly influence and affect the price of futures contracts in Crude Oil, Heating Oil, and New York Harbor Gasoline.

6.    Defendants' strategy was to execute approximately 20-30% of Optiver's futures trades just before the Close and the remainder during the Close.

7.    Having accumulated a large net TAS position during the trading day, Defendants intended to – and on several occasions did – implement this strategy to trade a large number of futures contracts in the opposite direction just prior to and during the Close, thereby exercising their market power to improperly influence and affect the price of futures contracts in a desired direction.

8.    The Defendants' intent is well documented by their own emails and phone recordings which discuss their efforts to "hammer," "influence," "push," "move," "whack," and "bully" the prices of futures contracts in Crude Oil, Heating Oil and New York Harbor Gasoline.

9.    As a result of the manipulative trading scheme, Optiver reaped profits of over $1 million.

10.    As is more fully alleged below, Optiver by and through its employees and agents, including, but not limited to, Defendants Dowson and Bastiaan van Kempen ("van Kempen"), Chief Executive Officer of Optiver, along with Optiver VOF, Optiver Holding, and Meijer, engaged in a scheme of price manipulation that violated the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 1, et seq. (2006).

11.    As more fully described below, Defendants Optiver, Dowson, and Meijer violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

12.    At all relevant times, Dowson, Meijer, and van Kempen, each had control over Optiver and the actions of its agents and employees who executed the manipulative scheme. Accordingly, Dowson, Meijer, and van Kempen, are each liable for Optiver's violations of the Act alleged herein, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

13.    Optiver, Optiver Holding, and Optiver VOF are also liable for violating Sections 6(c), 6(d), and 9(a)(2) of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), by virtue of the acts of their officials, agents, or other persons acting within the scope of their employment or office, including Defendants Dowson and Meijer.

14.    Furthermore, on or about March 26, 2007, Optiver and van Kempen, in a communication with NYMEX, willfully falsified, concealed, or covered up by trick, scheme or

artifice a material fact or made false, fictitious, or fraudulent statements or representations in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

15.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Plaintiff brings this action to enjoin such acts and practices, and compel compliance with the Act.  In addition, Plaintiff seeks civil monetary penalties and such other equitable and ancillary relief as the Court deems necessary or appropriate under the circumstances.

16.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in this Complaint or similar acts and practices, as is more fully described below.

## II.
## JURISDICTION AND VENUE

17.    This Court has jurisdiction pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any person, or to enforce compliance with the Act, whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

18.    Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Defendants transacted business within this District, and the acts and practices in violation of the Act occurred within this District.

## III.
## THE PARTIES

## A.  PLAINTIFF COMMODITY FUTURES TRADING COMMISSION

19.    The Commodity Futures Trading Commission ("CFTC") is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17

C.F.R. §§ 1 *et seq.* One of its core responsibilities is to protect the public interest by deterring and preventing price manipulations of the commodity markets or futures markets, or other disruptions to market integrity. Section 3(b) of the Act, 7 U.S.C. § 5(b).

### B. DEFENDANT OPTIVER

20.     Optiver is an Illinois company, founded in 2003, with its principal place of business at 130 E. Randolph Street, Suite 1300, Chicago IL 60601.

21.     Optiver is a wholly owned subsidiary of Optra Curacao, which is wholly owned by Optiver Holding.

22.     Optiver trades commodity futures, options on commodity futures, stocks, and stock options, listed on organized exchanges in the United States, including, among others, NYMEX and the New York Stock Exchange.

### C. DEFENDANT OPTIVER HOLDING

23.     Optiver Holding is a Netherlands corporation, with its principal place of business at De Ruyterkade 112, 1011 AB Amsterdam, The Netherlands, which engages in trading activity through its subsidiary companies including Optiver and Optiver VOF, among others.

24.     Optiver Holding manages the activities of its subsidiary companies including Optiver and Optiver VOF through its Global Management Board (the "Global Management Board").

25.     In practice, two-thirds of the profits of Optiver and Optiver VOF are distributed to Optiver Holding, and the remaining one-third is distributed among the other partners of Optiver VOF.

### D. DEFENDANT OPTIVER VOF

26.     Optiver VOF is a Netherlands general partnership with its principal place of business at De Ruyterkade 112, 1011 AB Amsterdam, The Netherlands.

27.    Optiver VOF is comprised of various partners, including Defendant Optiver Holding, (through its wholly owned subsidiary Optiver BV), and Defendants Dowson, Meijer, and van Kempen (through their respective wholly owned companies, Cobblestones LLC,  Randal Derivatives BV, and Platinum Options BV).

### E. DEFENDANT CHRISTOPHER DOWSON

28.    Dowson is a citizen of the United Kingdom, currently residing in Chicago, Illinois.

29.    Dowson began working for Optiver VOF in September 2000 as an equities trader.

30.    In or about October 2006, Defendant Dowson began to spend time at Optiver, in Chicago.

31.    In or about January 2007, Defendant Dowson moved to Chicago and became the Head of Trading for Optiver.

32.    Beginning in or about January 2007, Defendant Dowson became, and was at all relevant times thereafter, responsible for Optiver's trading of, among other things, commodity futures, including Crude Oil, Heating Oil, and New York Harbor Gasoline.

33.    While Defendant Dowson was employed by Optiver and maintained a partnership interest in Optiver VOF, he participated in the development and execution of a manipulative trading strategy for the purpose of moving prices of certain NYMEX energy futures.  Defendant Dowson participated in and directed other Optiver traders, including but not limited to Ferhad Mekic ("Mekic"), in carrying out the manipulative trading scheme, as more fully described below.

34.    For 2007, Defendant Dowson received approximately $100,000 U.S. in salary and approximately €1,700,000 based on his partnership share in Optiver VOF.

- 6 -

## F.  DEFENDANT BASTIAAN VAN KEMPEN

35.     Defendant van Kempen is a Dutch citizen, currently residing in Chicago, Illinois.

36.     Defendant van Kempen began working at Optiver Holding in Amsterdam in or about October 1998, first as a trader and later as a director.

37.     In or about 2001, Defendant van Kempen moved to Chicago as the head of trading for Optiver's newly opened Chicago office.

38.     In or about 2003, Defendant van Kempen became the Chief Executive Officer of Optiver, and has maintained that position to the present date.

39.     At all relevant times, and as set forth below, Defendants van Kempen and Dowson jointly managed Optiver.

40.     Defendant van Kempen participated in the development of the manipulative strategy referenced herewith.

41.     Defendant van Kempen participated in strategic discussions and monitored the trading activity at Optiver as the manipulative scheme was being implemented.

42.     Defendant van Kempen also instructed Optiver's traders in executing the strategy.

43.     Defendant van Kempen is, and was at all relevant times, generally responsible for Optiver's business operations and relationships with exchanges and other third-parties.

44.     Defendant van Kempen's base salary was approximately $55,000 U.S. and in 2007 he received approximately USD $1,600,000 from his partnership share in Optiver VOF.

## G.  DEFENDANT RANDAL MEIJER

45.     Defendant Meijer is, and was at all relevant times, the Head of Trading, supervising the trading activity of each of Optiver Holdings' subsidiaries, including Optiver and Optiver VOF.

46.    Defendant Meijer is one of five members of Optiver Holdings' Global Management Board, which oversees Optiver, Optiver VOF and other affiliated entities.

47.    Defendant Meijer worked closely with Dowson to develop, refine and carry out the manipulative trading strategy.

48.    Defendant Meijer approved the manipulative strategy, with the understanding that Optiver would have the necessary influence and would be able to "control the VWAP."

49.    Defendant Meijer also directed the execution of the strategy by Optiver's traders, including, but not limited to one trader, in particular, whom Meijer instructed to make sure he is "trading big enough."

50.    In or about 2007, Defendant Meijer received approximately €1,700,000 from his partnership share in Optiver VOF and shareholding dividends from Optiver Holding.

## IV.
## OTHER RELEVANT ENTITIES

### H. NYMEX: THE EXCHANGE AND THE PRODUCTS ON WHICH DEFENDANTS PERPETRATED THE MANIPULATIVE TRADING SCHEME

51.    According to the NYMEX website, NYMEX "is the worlds' largest physical commodity futures exchange and the preeminent trading forum for energy and precious metals."

52.    NYMEX is located at One North End Avenue, New York, NY.

53.    NYMEX is a designated contract market under Section 5(b) of the Act, 7 U.S.C. § 7(b), and Commission Regulations 38.3(a)(1)(ii) and (iii).

54.    Commodity futures contracts are traded on exchanges, such as NYMEX, which provide a physical or electronic facility in which multiple market participants have the ability to execute or trade such futures contracts by accepting bids and offers made by other market participants, with prices displayed for all to see.

55.     Prices for transactions on NYMEX are continuously reported during the trading day.

56.     The prices displayed on the floor of the Exchange and on its electronic platforms are disseminated to information vendors and news services worldwide.

57.     Settlement prices for NYMEX contracts are reported daily.

58.     NYMEX also reports trading volume and open interest on a daily basis.

59.     NYMEX prices are used as global benchmarks for a variety of energy markets; accordingly it is paramount that the markets have confidence in the integrity of these transactions.

**(i) THE NYMEX ENERGY FUTURES TARGETED BY DEFENDANTS' MANIPULATIVE TRADING STRATEGY**

60.     As part of its energy complex, NYMEX offers commodity futures contracts in Light Sweet Crude Oil ("Crude Oil" or "CL"), New York Harbor Heating Oil ("HO"), and New York Harbor Reformulated Gasoline Blendstock ("New York Harbor Gasoline" or "RBOB").

61.     For purposes of this complaint, a commodity futures contract is an agreement to purchase or sell a commodity for delivery in the future at a price that is determined at initiation of the contract, that obligates each party to the contract to fulfill the contract at the specified price, that is used to assume or shift price risk, and that may be satisfied by delivery or offset.

62.     As more fully alleged below, Defendants' trading involved three energy contracts on NYMEX.

63.     The NYMEX Crude Oil futures contract trades in units of 1,000 U.S. barrels (42,000 gallons) of West Texas Intermediate light sweet crude oil ("WTI"), and the delivery point is Cushing, Oklahoma.

64.    The price for the NYMEX Crude Oil contract is quoted in U.S. dollars and cents per barrel and the minimum price fluctuation (also known as one "tick") is $0.01 (1¢) per barrel ($10.00 per contract).

65.    The NYMEX Heating Oil futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery in New York harbor, which is the principal cash market trading center.

66.    The price for the NYMEX Heating Oil contract is quoted in U.S. dollars and cents per gallon and the minimum price fluctuation (or one "tick") is $0.0001 (0.01¢) per gallon ($4.20 per contract).

67.    The NYMEX New York Harbor Gasoline futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery at petroleum products terminals in the New York harbor.

68.    New York Harbor Gasoline is a wholesale non-oxygenated blendstock traded in the New York Harbor barge market.

69.    The price for the NYMEX New York Harbor Gasoline contract is quoted in U.S. dollars and cents per gallon and the minimum price fluctuation (or one "tick") is $0.0001 (0.01¢) per gallon ($4.20 per contract).

70.    Unless otherwise noted, all futures contracts referenced herein are contracts for delivery in April 2007.

71.    The NYMEX Crude Oil, Heating Oil, and New York Harbor Gasoline futures and TAS contracts may be traded on the NYMEX trading floor by open outcry trading, from 9:00 AM until 2:30 PM, and may be traded electronically on Globex (described below) from 6:00 PM the previous calendar day until 2:30 PM.

- 10 -

72.    In accordance with NYMEX rules, the Crude Oil, Heating Oil, and New York Harbor Gasoline futures contracts, in certain circumstances, also may be traded in a two-minute trading session, which takes place after the close of trading (the "Post-Close").

73.    NYMEX also permits traders to purchase and sell Crude Oil, Heating Oil, and New York Harbor Gasoline via its "Trading at Settlement" or "TAS" procedure.

74.    TAS contracts are futures contracts, except that the parties determine at the initiation of the contract that the price will be the day's settlement price plus or minus an agreed differential.

75.    A TAS contract which has been bought or sold can be offset by trading a futures contract in the opposite direction.

76.    A TAS contract is available for trading for the front two months (i.e. the upcoming delivery month and the following delivery month), except on the last trading day for the underlying futures.

77.    A TAS contract is priced either at par or based on a differential (plus or minus) in points off settlement in the underlying cleared product.

78.    A TAS trade done at the price of 100 will clear exactly at the final settlement price of the day.

79.    The maximum differential for a TAS contract is 10 "points" or "ticks" from the settlement; i.e., TAS contracts are bought and sold in a range from 110 to 90. One point or tick in a TAS contract corresponds to the minimum price fluctuation in the underlying future.

80.    Because TAS contracts are priced according to the settlement price for the underlying futures, if a trader with a TAS position can successfully trade futures in the opposite direction, such that the average price of its futures trades is equal to the final settlement price, the

price of the futures trades would equal the price of the TAS trades – adjusting for any differential.

81.     A trader can profit by buying and selling TAS contracts, making money on the difference in price; this activity is known as "scalping."

82.     In addition, a trader can make a profit by either selling TAS contracts for a premium (101 or above) or buying for a discount (99 or below) and subsequently trading futures in the opposite direction for an average price equal to or better than the settlement price.

83.     Unless otherwise noted, all TAS contracts referenced herein are contracts for April 2007.

**(ii)    THE SETTLEMENT PROCESS**

84.     The settlement of futures contracts is subject to rules promulgated by NYMEX.

85.     The settlement price is the price established by the NYMEX settlement committee at the close of each trading session as the official price to be used by the clearinghouse in determining net gains or losses, margin requirements, and the next day's price limits.

86.     In accordance with NYMEX rules and procedures, at all relevant times, the settlement price for the April 2007 futures contracts in Crude Oil, New York Gasoline, and Heating Oil was derived by calculating the volume weighted average of the prices, referred to as the VWAP, at which trades were conducted during the Close, i.e., from 2:28 to 2:30 PM.

87.     All times referenced herein are Eastern Time unless noted otherwise.

88.     The VWAP includes both electronic trading activity and floor trading activity.

89.     The final determination as to a settlement price is made by the Settlement Price Committee. The Settlement Price Committee includes a NYMEX employee, who has final authority in determining the settlement price of the Crude Oil, Heating Oil and New York Harbor Gasoline Futures Contracts.

(iii)    **NYMEX PROHIBITS THE USE OF TAS POSITIONS AS A WAY TO MANIPULATE THE SETTLEMENT PRICE**

90.    On or about October 19, 2006, NYMEX issued a compliance advisory:

> Compliance Advisory:  Disruptive Use of TAS and MO Trading Practices
>
> Members are reminded that **misuse of TAS or MO trades to acquire a position in order to unfairly affect a settlement price subject** [sic] **the member and/or the customer to disciplinary action for any of a number of rule violations** including but not limited to attempted price manipulation, disruptive trading, wash trading, or conduct substantially detrimental to the exchange, **investigation of suspected manipulative pricing involving TAS will focus on the percentage of TAS positions acquired** by a trader, group or traders or customer(s) **and whether the offset of that position during the close was disruptive, collusive, and or caused or attempted to cause aberrant price movement in the close.**

NYMEX Notice No. 548 (10/19/2006), available at

http://www.nymex.com/notice_to_member.aspx?id=ntm548&archive=2006 (emphasis added).

91.    The October 19, 2006 NYMEX Compliance Advisory was available to the public on NYMEX's website at all relevant times.

**I.    GLOBEX:  THE TRADING PLATFORM USED IN DEFENDANTS' MANIPULATIVE TRADING SCHEME**

92.    NYMEX is a party to a technology services agreement between NYMEX and CME Group, pursuant to which electronic trades of certain NYMEX products take place on the CME/Globex trading platform ("Globex").

93.    Globex is an electronic trading platform on which customers can directly place trades.

94.    NYMEX products, including the Crude Oil, Heating Oil, and New York Harbor Gasoline futures and TAS contracts are available to be traded via Globex.

- 13 -

95.    TAS contracts for a particular trade date may be traded via Globex from 6:00 PM the previous calendar day until 2:30 PM.

96.    A Globex user can view quotes placed by other traders. The Globex screen shows the quantity and price of the best five bids and asks in the system in real time. The Globex screen also shows the quantity and price of executed trades as they occur.

97.    In addition to trading NYMEX Crude Oil TAS contracts via Globex, the Defendants also traded IntercontinentalExchange ("ICE Futures Europe") WTI TAS contracts that, like the NYMEX TAS, were priced based on the daily settlement price of the NYMEX Crude Oil futures contract.

## V.
## THE FACTS: HOW DEFENDANTS DEVELOPED AND IMPLEMENTED THEIR SCHEME TO MANIPULATE THE NYMEX MARKETS IN CRUDE OIL, HEATING OIL AND NEW YORK HARBOR GASOLINE

98.    In or about January 2007, Optiver, under Defendant Dowson's direction, began trading TAS contracts in Crude Oil, Heating Oil, and New York Harbor Gasoline.

99.    In or about March 2007, Defendants developed and implemented a manipulative scheme by which, having accumulated a large net long or short TAS position, they intended to significantly increase Optiver's profits by trading large volumes of futures contracts in the opposite direction just before and during the Close with the goal to improperly influence and affect the prices of futures contracts in Crude Oil, Heating Oil, and New York Harbor Gasoline.

100.    To effectuate their manipulative scheme to "hammer," "whack," or "bully" the prices of the Crude Oil, Heating Oil and New York Harbor Gasoline futures contracts around and during the Close, Defendants, through Optiver, after having accumulated a large net TAS position in one or more of these products, traded a significant volume of futures contracts in the opposite direction, just before and during the Close.

101.     Optiver's strategy was to execute approximately 20-30% of its futures contract trades just before the Close and the remainder during the Close. Having accumulated a large net TAS position during the trading day, Defendants intended to – and on several occasions did – implement this strategy to trade a large number of futures contracts in the opposite direction just prior to and during the Close, thereby exercising their market power to improperly influence and affect the price of futures contracts in a desired direction.

102.     The recordings referenced herein and contained on Exhibit A hereto are true and correct copies of recordings of telephone conversations of employees or agents of Optiver or Optiver VOF, as identified herein. These recordings were created and maintained by Optiver in the course of its regularly conducted business.

103.     The emails attached as Exhibits B-K are true and correct copies of emails sent by the employees or agents of Optiver, Optiver Holding, or Optiver VOF, as indicated on the email, in the course of regularly conducted business.

## A. PRELUDE TO THE MANIPULATIVE SCHEME: ACCUMULATING A LARGE TAS POSITION

104.     Throughout March 2007, prior to implementing their manipulative trading scheme to influence or affect Crude Oil, Heating Oil, and New York Harbor Gasoline futures prices by buying or selling large number of futures contracts just prior to and during the Close, the Defendants in each instance accumulated a large net long or short TAS position.

105.     Beginning at or about 6:00 PM, when a new session of TAS trading began on NYMEX, Optiver began entering orders for TAS contracts for the following day, placing a series of orders to buy TAS contracts at a range of prices and a series of orders to sell an approximately equal number of TAS contracts also at a range of prices.

106.    The Globex system operated on a "first in, first out" system, meaning that bids and offers quoted at the same price would be executed based on the order in which they were entered into the system.

107.    However, in the Globex system, an offer to sell at a lower price, or to buy at a higher price, would be placed in the queue for execution ahead of pre-existing orders at less competitive prices.

108.    To ensure that their orders were first in the queue, Defendants used an Excel spreadsheet, which had been developed for Optiver to work with the Eccoware system Optiver used to place its orders on Globex. The program was designed to rapidly enter a series of orders into Globex and was referred to by Optiver as the "Hammer."

109.    Optiver's traders had frequent discussions about improving the "Hammer" to make sure Optiver's orders were getting into the system first.

110.    During a conversation on March 5, a trader for Optiver VOF told Mekic:

> "I'll look into improving the Hammer tool tomorrow, so that we can do this with a finer frequency so that should give us a better chance of being up front again."

Exhibit A at WAVFILE 128190 at 02:05.

111.    Typically, few trades were executed overnight and Optiver's TAS trades would take place the following day. Throughout the trading day, Dowson or other traders under his direction would adjust Optiver's orders – cancelling or modifying existing orders and placing new ones – often thereby increasing Optiver's net long or short TAS position in a manner that resulted in Optiver accumulating a net long or short TAS position.

112.    By approximately 2:25 PM, Optiver typically had accumulated a large net long or short position in TAS contracts for Crude Oil, Heating Oil, and/or New York Harbor Gasoline.

113.    At or about 2:25, Optiver's traders would turn their attention to trading futures contracts.

### B.  THE EXECUTION OF THE MANIPULATIVE SCHEME:  TRADING FUTURES TO MANIPULATE THE PRICE OF CRUDE OIL, HEATING OIL, AND NEW YORK HARBOR GASOLINE

114.    Beginning at approximately 2:25 up until 2:27:59 (the "Pre-Close"), Optiver typically executed 20-30% of the futures trades called for under Defendants' manipulative scheme.

115.    Defendants intended for Optiver's Pre-Close trades to begin driving the price of Crude Oil, Heating Oil and/or New York Harbor Gasoline futures contracts in a certain direction.

116.    Defendants' ultimate goal was to ensure that there would be a significant and favorable price differential between the futures contracts Optiver traded during the Pre-Close and the settlement price, which would, in turn, determine the value of Optiver's TAS position.

117.    Because the futures contracts traded directly offset the TAS contracts, if Optiver could trade 20-30% of its futures contracts during the Pre-Close for a price better than the settlement price and trade the remaining 70-80% of its futures contracts, during the Close, for a weighted average price close to the settlement price, Optiver would achieve a significant profit overall.

118.    According to Meijer, the Defendants' manipulative scheme was all "built on the idea that we can control the VWAP."

119.    Because the settlement price is equal to the VWAP during the Close, Defendants wanted to ensure that Optiver's trades during the Close were executed at an average price close to or better than the VWAP.

120.    During the Close, Defendants intended for Optiver to execute approximately 60% of its planned trades of futures contracts within the first minute and the remaining 40% in the second minute.

121.    All of Optiver's futures contracts trades during the Pre-Close and the Close were entered into Globex by traders under the supervision of Dowson and Meijer.

122.    Defendants maintained a software program developed in-house, which processed information about prices and quantities of trades being executed and showed a running calculation of the VWAP during the Close.

123.    Defendants Dowson and Meijer agreed that if Optiver did not seem to have the necessary ability to influence and affect the price on a given day, they would limit the amount of futures contracts traded during the Pre-Close that day and simply try to replicate the VWAP with their own trading during the Close.

## C. OPTIVER EXECUTES ITS MANIPULATIVE SCHEME IN MARCH 2007

124.    Defendants effectuated the manipulative scheme through a variety of acts and practices that were intended to manipulate the prices of NYMEX futures contracts in Crude Oil, Heating Oil, and New York Harbor Gasoline.

125.    As alleged in more detail below, throughout March 2007, Defendants and other Optiver and Optiver VOF employees engaged in discussions and communications which reveal the details of how their plan was executed and reflect their manipulative intent on the 19 instances to, after having accumulated a significant net long or short TAS position, trade a significant volume of futures contracts in the opposite direction during the Pre-Close and Close.

126.    Defendants intended to create artificial prices in Crude Oil, Heating Oil, and New York Harbor Gasoline futures contracts by placing large orders just before and during the Close.

127.    Repeatedly, throughout March 2007, Defendants attempted to manipulate the price of the Crude Oil, Heating Oil, and New York Harbor Gasoline futures contracts by trading a large number of futures contracts during the Pre-Close and the Close.

128.    Defendants knew that Optiver's trading would exert sufficient pressure to influence the price of futures contracts during the Pre-Close and the Close.

129.    Throughout March 2007, Defendants and other Optiver, Optiver Holding, and Optiver VOF employees and agents engaged in numerous conversations in which they developed and refined their manipulative scheme.

130.    Many of these conversations evidence the Defendants' manipulative intent.

131.    Throughout March 2007, Defendants and other Optiver, Optiver Holding, and Optiver VOF employees and agents also engaged in hundreds of additional overt acts in furtherance of their manipulative strategy.

132.    In an email from Dowson to Meijer and copying Van Kempen at or about 3:31 PM CT on March 2, Defendant Dowson outlined Optiver's strategy and the need to properly apportion the trading of futures contracts – and even trade for a loss during the Close – to control the movement of the price.  Exhibit B.

133.    In that email to Meijer, Dowson wrote:

> **. . . we are going to hammer the futures**.
> To hedge against "market risk" we have traded oil futures in the opposite direction.  This hedge cost $60k today.  We also carefully consider the percentage of futures to trade before [the two-minute close] (these are the ones that make the profit) and the ones we need to do during [the close] in order **to force the market down (the ones that cost money) . . ..**

Exhibit B (emphasis added).

134.    Defendant Dowson also discussed the trading activity during a phone call on or about March 5 at 10:55 AM CT with Edwin van der Kruk, a managing trader with Optiver VOF.

135.    In that conversation, Defendant Dowson relayed to van der Kruk a conversation that he and Mekic had on March 2 and explained how they planned to disguise Optiver's TAS activity by bidding close to even to enable them better to control the prices of futures contracts around and during the Close.

136.    Dowson and van der Kruk's conversation continued:

Dowson:    we basically just want to have a position, we pretty much want a position everyday. So we're just we're just 99 and 101 now for 500 and then, um, yeah we can also, what we thought then, we can probably disguise it a bit better as well.

van der Kruk:    How do you mean?

Dowson:    Yeah well, it's not as obvious if people are 107 or 108 bid everyone knows that there's going to be something coming whereas if it trades normally close to one, yeah, you can hack sometimes **you can be aggressive pushing it** other times, you can even do it a bit the other way around, uh, sometimes.

Exhibit A at WAVFILE 1281X1 at 8:50 (emphasis added).

137.    On or about March 5, Optiver was also experiencing difficulty getting its TAS orders into the Globex system before other traders and was looking for a way to remedy that problem.

138.    On or about March 5 at 10:12 am (CT), Mekic had a conversation with Gerben Goojiers, a trader for Optiver VOF. Goojiers told Mekic he had received an e-mail saying that Optiver "wasn't first anymore."

139.    At the conclusion of the conversation, Goojiers stated:

I'll look into improving the Hammer tool tomorrow, so that we can do this with a finer frequency so that should give us a better chance of being up front again.

Exhibit A at WAVFILE 128190 at 2:05.

140. Defendant Meijer decided that TAS would be traded by Optiver and not Optiver VOF, which allowed Optiver to raise the size of the positions with which it could move the price.

141. Defendant Meijer also cautioned Defendant Dowson to be mindful of the limits he had set until they were sure of their ability to manipulate the markets.

142. On March 7, at approximately 3:21 AM (CT), Defendant Meijer wrote to Defendant Dowson, copying Defendant van Kempen:

> I talked to Jan-Jaap and Nick about the TAS's.
>
> They agreed to doing them from 1 spot being the US.
>
> You can then raise your limits to 1000 per commodity (this equals app. 75 min [million] per underlying right ?)
>
> Please respect those limits.
>
> When we gain experience **and become more certain that we can influence VWAP** I'm sure we can raise further.
>
> They wondered though about some TAS's (e.g Natural Gas), because you are not trading them.
>
> They would like to experiment further on them.

Exhibit C (emphasis added).

143. Although Defendants' manipulative scheme focused on Optiver's trading of NYMEX products, Defendant Meijer sought to expand the manipulative scheme.

144. On March 8, at or about 11:37 am CT, Defendant Meijer spoke with Defendant Dowson, seeking advice on how Optiver VOF could trade another contract, similar to TAS, which traded on ICE Futures Europe in a manner consistent with the scheme. Exhibit A at WAVFILE 128XCP.

145. Defendants Meijer and Dowson had the following exchange:

Meijer:     I wanted to know how you exactly get the TAS contracts because we get one in the, there is also this, what's it called, the Brent, have you seen that one?

Dowson:     Yeah, yeah, we quote in that as well.

- 21 -

| Meijer: | no, but . . . the minute marker . . . |
|---|---|
| Dowson: | . . . essentially that trades,--it only can trade at even, basically. |
| Meijer: | yah, we trade it at zero because I wanted to see how powerful you . . . you actually have it, **how powerful your position is** when you want to beat the VWAP – or, well actually not even beat it, or just . . .yah, **if you can move the market** . . . I was just wondering how you guys traded it. |

Exhibit A at WAVFILE 128XCP at 0:05 (emphasis added).

146.   Defendant Dowson discussed the significance of market power in the

manipulative scheme.

| Dowson: | it depends on the product actually and for us for the oil, for the WTI,     we've really not been trying to bully it . . . normally you don't have some like big counter party there is enough liquidity there that basically **the worse thing that can possibly happen to you is that you try to bully it and you run out of power** |
|---|---|
| Meijer: | (laughter) and then the market just moves apart from what you were doing . . . |
| Dowson: | . . . if you compare that to the WTI, . . . what we do with that, we never try andreally it any where (inaudible) -- we never really  try and push it, and so that's not the one where – where we're sort of using our scheme. |
| | *       *       * |
| Dowson: | . . . when we really made our good money it's come from in the products where – then you're talking about normal trading during those 2 minutes is 300 futures or 400 futures, something like that. |

Exhibit A at WAVFILE 128XCP at 01:21 and 05:30 (emphasis added).

147.   Defendant Dowson then explained to Defendant Meijer that the size of the TAS

position Optiver had going into the close was critical and a position such as 200 in gasoline was

undesirable because it was not large enough to enable Optiver to move prices.

148.  Defendants Dowson and Meijer had the following exchange:

Dowson:    It's actually nicer to have a position of 800 than a
           position of 200. A position of 200 in the gasoline for
           example is probably the worst you can have . . .

Meijer:    You really don't know what to do . . . **you cannot
           move anything**.

Dowson:    **You have to trade a big amount during the time, but
           you don't dare to bully anybody**, so that's probably
           the worst position that you can have.

Meijer:    Yeah, I want to see how it works a little bit because **it's
           really interesting if there is bullying, let's say its
           possible at a certain stage** – it's definitely not risk free
           . . . but I'll maybe try again tomorrow . . .

Exhibit A at WAVFILE 128XCP at 06:54 (emphasis added).

149.  Defendants Dowson and Meijer then discussed the cover story they planned to use
in the event that Optiver is investigated for possible manipulation. Dowson and Meijer agreed
that if they bid at 99 and offered at 101, they could claim that their intent was really to buy low
and sell high, or if they bid at even, they could claim that they believed they could trade futures
contracts for better than the VWAP and get "edge" – an explanation which Dowson then
acknowledged was a "fairy story."

150.  Defendant Dowson and Meijer had the following exchange:

Dowson:    what I like being the -- sort of 99 bid at 101 as well at
           least is that you've got a good uh. . . I mean I suppose
           even if you sell even you could still say - look we think
           we can get edge and trade in the same sector, it doesn't
           matter - I was just thinking more about **if people come
           to you with stories about why you manipulated the
           market** and things like this

Meijer:    Yeah, okay, then **you can still say yeah because we
           can still make some from scalping** – but you actually
           don't really manipulate because you actually have an
           order that you just need to close your position

Dowson:    We just, we can execute better than VWAP, that's why
           we do it

Meijer:    Exactly, that's what we think at least (chuckling)

- 23 -

Dowson:  **That's a fairy story.** . . .

Exhibit A at WAVFILE 128XCP at 07:54 (emphasis added).

151.    Defendant Dowson then explained to Defendant Meijer exactly how Optiver

traded to maximize the influence of its trades on the market.  He advised Meijer to "try and push

it" prior to the time in which the settlement will be determined, and then the trading during the

close should be used to "defend" or control the price enough to ensure that it doesn't move back

in the other direction.  Exhibit A at WAVFILE 128XCP at 10:17.

152.    Finally, Defendant Dowson cautioned Defendant Meijer against "running out of

power" to control the price through the end of the settlement period.

153.    Defendant Dowson told Defendant Meijer:

> what you might want to do just as a tip for tomorrow . . . **do the
> pushing as much as you can in the minute before** . . . especially
> because it's more liquid you should just do this . . . .basically, let's
> say you have a 1000 to do tomorrow, even just 30 seconds before
> the minute marker starts , just do 500 then, **let's say you have to
> buy,  and really try and push it up as much as you can  . . . and
> then in the minute don't try and push it too much harder** . . .
> just try and defend it let's say . . . the thing that's nice about that
> . . . **the idea of it is to attract the liquidity ..so you have more
> chance to sort of bully in the minute before** where  . . . that's the
> 300 minute as opposed to an 800 minute . . . so that's one of the
> things we've tried as well . . . but the other thing to remember is
> that **the worst thing that can happen is running out of power.**

Exhibit A at WAVFILE 128XCP at 9:58 (emphasis added).

154.    Defendant Meijer implied that the primary risk of the manipulative scheme was

an unexpected price move in the opposite direction after the Pre-Close trading was completed.

Exhibit A at WAVFILE 128XCP.

155.    Defendants Meijer and Dowson agreed that if they saw another party trading in

the opposite direction to them – which would likely limit their ability to manipulate the market –

they would abandon their manipulative scheme on that occasion and simply try to minimize their losses or break even by matching the VWAP. Exhibit A at WAVFILE 128XCP at 11:58.

156.    Defendants Dowson and Meijer concluded their conversation, acknowledging that their manipulative scheme was "a fun game" and contemplating whether or not they could expand it to other markets, including "soft" commodities such as sugar, wheat or corn. Exhibit A at WAVFILE 128XCP at 12:04.

157.    Also, on March 9, Defendants Dowson, van Kempen and Meijer participated in a conference call with Johann Kaemingk, the CEO of Optiver VOF and a member of Optiver Holding's Global Management Board, during which they discussed the TAS strategy, potential risks and whether or not the trading scheme constituted manipulation. Exhibit A at WAVFILE 1293QN.

158.    Defendant Meijer commented that the trading during the Close did not present a significant risk because during that time, although it "might be a bit messy," in the worst case scenario Optiver would only do "a couple of ticks worse than VWAP." Exhibit A at WAVFILE 1293QN at 22:10.

159.    Defendant Meijer added: "if you see funny things happening just . . . up til the expiration, you can still decide not to pre-buy or pre-sell." Exhibit A at WAVFILE 1293QN at 22:53.

160.    Next, Defendant Meijer explained that the biggest risk was from the portion of futures contracts which would be traded during the Pre-Close, but that he was glad he could set the risk limits for these trades.

161.    Defendants Meijer and Dowson along with Kaemingk discussed the amount of money which Optiver would be allowed to trade using its manipulative scheme and what percentage should be traded during the Pre-Close.

162.    Defendant Dowson explained that there is a lower risk if they take opposite positions in different products, but Kaemingk cautioned that one party can "manipulate[ ]" the market with "even one percent."  Exhibit A at WAVFILE 1293QN at 26:03.

163.    As the discussion continued, Defendants Meijer and Dowson explained to Kaemingk how the trading in futures contracts related to Optiver's TAS position, and Defendant Meijer declared that, in general, Defendant Dowson would be permitted to trade up to $250 million in connection with the scheme, $50 million of which could be used for trades during the Pre-Close, asking for a more detailed breakdown if Defendant Dowson planned to trade a combination of positions.

164.    Defendant Meijer stated that his approval of Optiver's TAS trading was founded on the understanding that Optiver "can control the VWAP."  Defendant Dowson agreed, adding that for this reason, he was more cautious in trading Crude Oil than in New York Harbor Gasoline and Heating Oil, where he was more confident in Optiver's ability to manipulate the market.

165.    Defendants Dowson and Meijer continued:

Meijer:    **This is all built on the idea that we can control the VWAP.**

Yeah, as soon as we get indication that we can't we're not going to do it anymore actually or not like this at least.

Dowson:    Exactly.  And that's why we're also more cautious in the, um, way more cautious in the crude oil, than we are . . .in the products.

Exhibit A at WAVFILE 1293QN at 29:32 (emphasis added).

- 26 -

166.    Defendant Dowson then explained that he intended to trade in a volume sufficient to ensure that Optiver could manipulate prices in its favor, but not so much that the manipulative scheme would be likely to attract notice.

167.    Defendant Dowson said:

> Dowson:    I think my ideal position is going be around a thousand because then I do 500 beforehand and I have 500 to push, I get, I, **I can definitely push it, I'm very unlikely to go the other way. But I'm also not doing it so dramatically that it's . . . we're talking about it on CNBC or things like this.**

Exhibit A at WAVFILE 1293QN at 31:50 (emphasis added).

168.    Kaemingk commented that van Kempen was responsible for investigating the compliance issues.

169.    The parties expressed concern as to whether or not their conduct was manipulative but decided otherwise, despite evidence to the contrary.

170.    Defendant Dowson said:

> let's say we're going to buy things and make it go higher, if even, you might expect because **this is sort of artificial and pushing it up**, that it comes back down afterwards. But what we've seen is, if anything it tends to continue the same way. In other words, there seems to be genuine flow or buying pressure.

Exhibit A at WAVFILE 1293QN at 33:10 (emphasis added).

171.    Defendant Dowson then added that if they traded more futures contracts than they had in their TAS position, this would enable Optiver to push prices even further, but decided that this activity might be viewed as manipulation.

172.    Defendant Dowson explained:

> Dowson:    But what you could do then is of course, buy extra during the time to get it even higher and then sell them out at the end. But we've discussed that this is

> something that we see is, uh potentially could be
> seen as market manipulation, so we decided to
> to stay, uh, stay away from that.

Kaemingk:    Okay, agreed?

Dowson:    Yep.

Exhibit A at WAVFILE 1293QN at 33:41.

173.    During the call, Defendant Dowson checked on Mekic's trading, to ensure that Mekic was not "hacking" the New York Harbor Gasoline TAS contracts, which would reduce Optiver's TAS position, thus reducing the amount of futures contracts Optiver would trade during the Close. Exhibit A at WAVFILE 1293QN at 34:29

174.    In other words, Defendant Dowson was concerned that Mekic would not have enough futures contracts to bang the Close.

175.    Defendant Dowson explained: "Ferhad's got about 600 gasolines in his position, I'm just gonna make sure he's not hacking them too much." Exhibit A at WAVFILE 1293QN at 34:29.

176.    Defendants van Kempen, Meijer and Dowson then discussed developing software that would enable them to view the volume in the market and allow Optiver to see the amount of influence it has on the market.

177.    The conversation continued:

van Kempen:    is there any way else that we can ask Doug to uh
make some kind of tool as to better estimate the
volume during that time period so you can better
see what kind of effect that it will have on the
market. Is that correct?

Dowson:    Can we ask Doug to make some time tool to see
what effect this have on the market? Oh, we've,
we've, been uh, now we've, but we've been running
analysis on um, yeah, because we are trying, um to
improve how we make the VWAP as much as
possible, we've been running analysis on the

- 28 -

> volumes traded over the, yeah, uh the minutes
> before, the minutes during and how it goes, and,
> um, and yeah, so we can better approach the VWAP
> apart from anything. We should . . . uh, I'm quite
> sure we should be able to get some of the
> information you want I think.

Exhibit A at WAVFILE 1293QN at 34:54.

178.    As the discussion of the manipulative scheme concluded, Defendant Meijer asked

that he be kept informed about the details of Optiver's trading on a daily basis. Defendant

Meijer added that Optiver would trade the Crude Oil and related products (which includes

Heating Oil and New York Harbor Gasoline), but that he would like Optiver VOF to trade the

Minute Marker -a product similar to TAS –so that he can "get a feel" for it. Exhibit A at

WAVFILE 1293QN at 35:49.

179.    Defendant Dowson's email to Meijer copying Van Kempen on March 9, 2007 at

5:01PM also noted that Optiver "made a total of $256k in the TAS's. $30k of this came from

scalping TAS's." Exhibit D.

180.    Defendant Dowson's email on March 9, 2007 at 5:01 PM further noted "We

noticed that **it is not as easy to bully the market as it has been previously** when it was

'obvious' that the TAS's were bid/offered in a certain direction." Exhibit D (emphasis added).

181.    On or about the afternoon of March 13, Defendant Meijer wrote to Defendant

Dowson asking "have you tried the tas's [sic] in the crude already?" Dowson replied:

> We quote the crude everyday. But I am very wary about
> deliberately building up a big position there. **To be able to move
> the crude, we would need a position of substantial size.** I would
> think of the order of 5000 contracts. Are you willing to do it that
> big already?

Exhibit E (emphasis added).

182.    Defendant Meijer responded copying Van Kempen at 9:32AM: "Well the 50/250 limit holds, so **a bit over 4000 you can do.**" Exhibit E (emphasis added).

183.    On March 14, Defendant Dowson and Defendant Meijer discussed further refining their ability to manipulate the market.

184.    Defendants Dowson and Meijer discussed whether it would be preferable to take positions in different energy products opposite to one another to reduce risk or to take positions in the same direction to generate more power to move the markets.

185.    Defendants Dowson and Meijer had the following exchange:

> Meijer:     But it doesn't make sense actually to have then an opposite position in things that are correlated.
>
> Dowson:   Um, well you're actually, the way I see it is this, it's um potentially less profitable
>
> Meijer:     Yah
>
> Dowson:   Certainly um but that you could argue about but it is certainly less risky; because if you look at it like this ok, um, **if you do them both in the same direction, you just got more power essentially.**
>
> Meijer:     Yah, exactly because if you look at the example more simple that you have a hundred percent let's say ah for the same product for two months

Exhibit A at WAVFILE 12B220 at 05:54 (emphasis added).

186.    As the conversation continued, Defendants Dowson and Meijer discussed their power in the New York Harbor Gasoline market, explaining that under the $ 250 Million limit that was established, they could accumulate a position of 3,000, concluding that although they wouldn't even need that large a position to "bully" the market, a larger position would give them more power to manipulate the market. Exhibit A at WAVFILE 12B220 at 04:42.

187.    Defendants Dowson and Meijer had the following exchange :

Dowson:      **Don't need um all of that [3000 New York
             Harbor Gasoline contracts] in order to push it if
             you had a thousand you can really bully it
             around**

Meijer:      yea ok but **you can bully around more with more**

Exhibit A at WAVFILE 12B220 at 7:16 (emphasis added).

188.   In continuing to discuss the risks and potential benefits of taking positions in all

products in the same direction versus taking opposition positions, Defendants Dowson and

Meijer agreed that their decision should be based on their confidence that they can move the

markets.  Dowson expressed certainty that Optiver could move the market for New York Harbor

Gasoline, had doubts about their power in Crude Oil, but said he was going to try.

189.   Defendants Dowson and Meijer had the following exchange:

Dowson:      Basically you just take in more of a gamble if you have
             done the same way as each other.  Alright so the thing
             the thing that's **the deciding factor is really how
             powerful are we.**

Meijer:      Yea, but I agree that the definitely will be more of a
             gamble but of course it will be relied in the entire idea
             relied on the fact or the assumption that **we can move
             the market.**

Dowson:      yea it's a bit -- but **what I'm sure of is we can move
             the gasoline market.  Whether we can move the
             complex --**

Meijer:      Yea

Dowson:      that I'm not sure of

Meijer:      Yea, well with – yea, yea, **you said you need to try**

Dowson:      exactly so we need to try so when we have a good
             opportunity for it then uh we should definitely try . . .

Exhibit A at WAVFILE 12B220 at 9:49 (emphasis added).

190.   Defendant Dowson next explained to Defendant Meijer that he would be more

comfortable bidding at even to attract volume into the TAS market which would not ordinarily

- 31 -

trade in TAS, and thereby "manufacture" a TAS position for Optiver, in a product which he would be trading opposite a different product. Exhibit A at WAVFILE 12B220 at 10:29.

191.    The conversation continued with a discussion about the Brent-WTI spread during which Defendant Dowson commented "because this Brent-WTI spread it would be nice to push that in our favor." Exhibit A at WAVFILE 12B220 at 11:20.

192.    On March 15 Nicholas Stepanek, an Optiver trader, emailed Defendant Dowson and suggested that Dowson might succeed in his efforts to manipulate the market for Crude Oil if he traded a larger volume, approximately 6,000 contracts.

193.    Stepanek wrote:

> **Have you thought about just doing the crude massively big?  I think with 6000 or so you can even move that one, like we're doing with the minute marker.**  Obviously the gasoline is just a great product for it.  **Could this be considered market manipulation?**  As long as we don't trade against ourselves, everything seems above board, but **I still think the exchange might start to look into it.**

> Exhibit F (emphasis added).

194.    Defendant Dowson replied he did not yet have the authority to trade 6,000, but he would test his ability to manipulate the Crude Oil market with 4,000.  On March 15 at 8:40AM, Defendant Dowson wrote:

> 6000 crudes is over the limit that I agreed with Johann, but next time someone pays 1 tick over (i.e. genuine interest) for some size, **I am going to do 4000, and see how our power is.**

> Exhibit F (emphasis added).

195.    On March 15 at 5:29 PM, Dowson emailed Meijer, copying van Kempen to advise them that despite having acquired large position in gasoil (a contract similar to Heating Oil traded on ICE Futures Europe), they were not able to manipulate the gasoil market that day. Exhibit G.

196.    Defendant Dowson's email also reported the results of Optiver's trading in Crude Oil, commenting that because it was close to the expiration of the April Crude Oil contract, there was less volume in the market and Optiver had a greater ability to manipulate the market.

197.    Defendant Dowson wrote:

> Elsewhere, we traded the gasoil TAS that is at the same time as the minute marker. Despite having a position of 2000 futures we didn't have enough power. We made $1k there. In the main event, we had a good size crude position. 2800 futures. Since we are close to expiration, the future is becoming more illiquid, **which makes influencing it easier**.

Exhibit G (emphasis added).

198.    On March 16, Defendant Dowson called Defendant Meijer to inform him of the success Optiver had with the manipulative scheme that day. Meijer acknowledged that having "real size," that is large positions, was "finally . . . paying off." Exhibit A at WAVFILE 12BM2P at 0:20.

199.    In that conversation Defendant Dowson confirmed that, with regard to crude oil, he and another Optiver trader decided to "just whack the oil." Exhibit A at WAVFILE 12BM2P at 01:19.

200.    Defendant Dowson also explained to Defendant Meijer how he suspected that another trader, one of Optiver's competitors, lost a lot of money as a result of Optiver's trading. Dowson explained that the competitor had established a large TAS position but must have traded all or most of its futures contracts before Optiver began trading at approximately 2:26 or 2:27. During this time, the price of the futures contract declined; however, once Optiver began buying futures contracts during the Pre-Close and Close, it caused the price to increase up to and above the price at which the other party had traded.

201.    Defendants Dowson and Meijer had the following exchange:

Dowson:    I think . . . our competitor, I think today has lost a really really a lot of money. Because, when, after he sold all his bids at even and just offered over, there's really big downticks in the oil, the whole complex went down and actually afterwards we thought it was like there was some news or something. So he must have bought really a lot of crudes on the day in the TASs sold them all out beforehand so there's a big spike down and then at sort of 26, 27 past **we started buying and basically bought it all the way back up and more.**

Exhibit A at WAVFILE 12BM2P at 2:04 (emphasis added).

202.    Defendant Meijer then asked Dowson how much of the crude trading was done in the Pre-Close, before Optiver "brought . . . up" the price for the settlement. Dowson told him that he traded about 800 Crude Oil futures in the Pre-Close. Exhibit A at WAVFILE 12BM2P at 03:54.

203.    Defendants Dowson and Meijer next discussed that Optiver's profits from the manipulative scheme totaled approximately $1.2 million for the week of March 11-16, and approximately $2 million overall up to that point.

204.    Defendant Dowson also described for Meijer the details of his strategy for building up a large TAS position.

205.    Defendant Dowson's strategy – rather than simply placing a range of bids and offers and waiting for the market to react – was to decide early in the day whether to build a long or short position and then put in quotes, either bids or offer depending upon the position Optiver had decided to pursue, priced at even, rather than in accordance with market conditions.

206.    Defendant Dowson explained to Defendant Meijer that they had tried the manipulative strategy in Crude Oil that day because they also had a large New York Harbor Gasoline position and thought it would be best to trade them in the same direction. Meijer agreed that having the related products trading in the same direction would make both positions more powerful.

- 34 -

| Dowson: | Basically the reason we did it in the crude today was because hardly any trades had happened and we thought, well it's better to have it the same side because we had such a big RBOB [New York Harbor Gasoline] position |
|---|---|
| Meijer: | Yeah, exactly so you just make it a bit more powerful for either one . . . |

Exhibit A at WAVFILE 12BM2P at 5:32 (emphasis added).

207.    Defendants Dowson and Meijer agreed that while Dowson was on vacation, Meijer would push Mekic to build up large TAS positions, joking that if Optiver could not execute the manipulative scheme, it would be limited to scalping, which would be far less profitable.

208.    On March 19 at 11:22 AM (CT), Defendant Meijer emailed Mekic:

I assume you are responsible for trading the TAS's this week.

**I also assume you will be trading them big enough** even when Chris is away.

Can you e-mail me daily with the positions you were having, what happened and the results?

Exhibit H (emphasis added).

209.    On March 19 at or about 1:08 PM (CT), Mekic replied to Defendant Meijer:

We are bidding even in all the oil products on the NYMEX (Oil 3000,  HO 2500 and Gasoline 2500). This gives us the best chance of getting some big positions without trading against other marketmakers, so now it is up to the market to sell to us. I will let you know what happened.

Exhibit H.

210.    On March 19, Mekic reported to Defendant van Kempen that Optiver had 2200 front month crude oil contracts and that **"it's expiration tomorrow so we had a fair amount of influence."**    Exhibit A at WAVFILE 12BXQ2 at 6:55 (emphasis added).

- 35 -

211.    Later on March 19, Mekic emailed Defendant Meijer: "As you can see, the crudes went really well. **We had lots of influence** due to the expiration tomorrow." Exhibit I (emphasis added).

212.    On March 19, Mekic also reported to van Kempen "I did the heating oils and we had almost 800 – **that should be enough influence**." Exhibit A at WAVFILE 12BXQ2 at 7:04 (emphasis added).

213.    On March 20, 2007 at 2:45PM, Mekic reported to Defendant Meijer:

> Today we had a textbook execution in the crude, heating oil and Brent. **We sold 20-30% beforehand, the market went down afterwards** so we hedged the TAS contracts with quite some edge. The gasoline position was of a medium size, so difficult to hedge and also the VWAP printed against us. **By quoting the heating oil and gasoline TAS contracts for substantial size we ended up doing 80-90% of the volume in the front month and so kept others out.**

Exhibit J (emphasis added).

## D.    OPTIVER'S MANIPULATIVE SCHEME IS DISCOVERED AND BROUGHT TO A HALT BY NYMEX

214.    In response to an inquiry by NYMEX compliance, on or about March 21, 2007 at 1:36 PM, Fortis Clearing Americas sent an email to Defendant van Kempen enclosing the NYMEX Advisory referenced above and attached as Exhibit K.

215.    On or about March 22, Defendant van Kempen and Optiver's counsel Steven Schwab participated in a conference call with Fortis and NYMEX.

216.    On or about March 26, when Defendant Dowson returned from vacation, he was advised about the NYMEX inquiry into Optiver's TAS activity.

217.    Optiver held another call with NYMEX on or about March 26, in which Defendant van Kempen, in response to an inquiry by NYMEX compliance, falsely stated that "what we're trying to do is just make markets in the TAS contract and hedge ourselves as well as

possible during that closing period and maybe slightly before. But you gotta do it before 1:30 'cause afterwards liquidity dries up completely." Exhibit A at WAVFILE OPTUS0002406 at 11:28.

218.    To further conceal the manipulative intent van Kempen explains Optiver's futures trading from 2:25 PM to 2:30 PM as "before the VWAP starts, we have a larger market risk and say the market is moving up and we need to and we're selling prior to, then the chances that we get close to a settlement price become much smaller. So that's why we can spread a little of the risk over a wider area because most of the exposure is during that two minute period." Exhibit A at WAVFILE OPTUS0002406 at 23:25.

219.    In that same call, in response to an inquiry by NYMEX of the profit motive of the trading strategy, van Kempen concealed the real profit motive from trading the futures and instead falsely stated that the profit motive is "the spread, capturing the spread" and that "anywhere where we trade, we make a bid and an ask spread and we believe we get paid on buying on the bid and selling on the offer." Exhibit A at WAVFILE OPTUS0002406 at 24:40.

220.    In or about the first week of April 2007 Optiver stopped its practice of recording its phone lines.

## E.    DEFENDANT VAN KEMPEN CONTROLLED OPTIVER

221.    Defendant van Kempen's responsibilities included supervising the Compliance Department, the Risk Management Department, Human Resources, and the IT Department.

222.    Defendant van Kempen is and was at all relevant times responsible for employee hiring, registration and supervision.

223.    Defendant van Kempen gave Mekic performance reviews in 2005, 2006, and 2007.

224.   Defendant van Kempen, along with Defendants Dowson and Meijer, determined the amount of bonuses to be given to Optiver's traders.

225.   Defendant van Kempen regularly communicated with the Global Management Board regarding Dowson's performance.

226.   Defendant van Kempen is and was at all relevant times responsible for the annual compliance meeting.

227.   Defendant van Kempen is and was at all relevant times responsible for ensuring that Optiver engages in acts or practices consistent with just and equitable principles of trade as set forth in Optiver's compliance manual, which expressly contains a prohibition on market manipulation.

228.   By allowing and encouraging Optiver's traders to execute the manipulative scheme, Defendant van Kempen abdicated his assigned responsibility to ensure that Optiver observe principles of just and equitable business practices and refrain from engaging in market manipulation.

229.   Defendant van Kempen was involved in the development of the TAS trading strategy implemented by Optiver, under the immediate direction of Dowson.

230.   During a telephone conference on March 9, Defendant van Kempen was tasked with investigating "all possible compliance risks." Also in this conversation, van Kempen stated that he had informed Optiver's risk manager of how Optiver trades TAS contracts. Exhibit A at WAVFILE 1293QN at 26:50.

231.   While Defendant Dowson was out of the office, Defendant van Kempen directly supervised Optiver's traders.

232. On or about March 19, Defendant van Kempen had a conversation with Mekic during which Mekic reported the results of the day's TAS and futures trades and his plans to accumulate a TAS position of approximately 2,000 to 2,500 the following day. Exhibit A at WAVFILE 12BXQ2 at 7:04.

233. Defendant van Kempen advised Mekic to trade no more than 25% of Optiver's future contracts before the Close.

234. Later in the conversation, Defendant van Kempen told Mekic:

> **You should milk it for right now, as much as you can, because you never know how long this thing is going to last.**

Mekic replied:

> I think the Crudes are the most advanced markets and that's where we made most of our money anyway. How much can the others develop? I think at some point we'll be hammering in all three of them. We need a good hammer because we need to know what we do now without worrying about other people. I think if we do well on the Crudes I don't see why the products shouldn't remain good for a while, at least.

Exhibit A at WAVFILE 12BXQ2 at 10:04 (emphasis added).

## F.  DEFENDANT DOWSON CONTROLLED OPTIVER

235. In 2007, Defendant Dowson gave the annual performance reviews for Optiver's traders, including Mekic.

236. Defendants Dowson and Meijer decided Mekic's annual bonus for 2007.

237. Defendant Dowson was responsible for hiring and firing traders for Optiver.

238. Defendant Dowson was responsible for Optiver's trading decisions and strategies.

239. Defendant Dowson directed and supervised the actions of Optiver's traders in executing the TAS trading strategy.

240. Defendant Dowson gave instructions to Mekic as to how to trade TAS contracts and the corresponding energy futures.

241.    Defendant Dowson decided how many orders for TAS contracts Optiver should enter into Globex.

242.    Defendant Dowson occasionally entered orders himself in addition to supervising trading by other Optiver traders.

## G. DEFENDANT MEIJER CONTROLLED OPTIVER

243.    The Global Management Board, of which Defendant Meijer was a member, made the decision, with Defendant van Kempen, to appoint Defendant Dowson as head of trading for Optiver in Chicago.

244.    Defendants van Kempen and Dowson regularly reported to Defendant Meijer as well as during a weekly telephone conference at which matters including trading and compliance were discussed.

245.    Defendant Meijer was able to and did influence the trading activity of Optiver.

246.    Defendant Meijer set the risk limits for Defendants' manipulative scheme.

247.    Defendant Meijer directly participated in the development and supervision of the manipulative scheme executed by Optiver, under Dowson's immediate direction.

248.    Defendant Meijer had authority over personnel decisions at Optiver.

249.    Defendant Meijer asked trader Ferhad Mekic to transfer from Optiver VOF to Optiver in Chicago.

250.    Defendant Meijer gave Mekic at least three performance reviews including one in October 2007.

251.    Defendant Meijer and Dowson decided Mekic's annual bonus for 2007.

252.    Defendant Meijer and the Global Management Board were responsible for reviewing Defendant Dowson's performance.

253.    Defendant Dowson's authority to implement the manipulative strategy was subject to Meijer's approval.

254.    Defendant Meijer had several conversations with Defendant Dowson in which he provided specific directions with respect to Optiver's TAS, and corresponding futures, trading.

255.    While Defendant Dowson was out of the office on vacation, Defendant Meijer directly supervised Mekic in executing the TAS and corresponding futures trading.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## H. OPTIVER'S TRADING IN MARCH 2007

256.    During March 2007, Defendants, through Optiver, engaged in trading with the

intent to affect the price of NYMEX energy futures contracts as follows:

| DATE | FUTURES CONTRACT |
|---|---|
| March 2 | New York Harbor Gasoline |
| March 6 | New York Harbor Gasoline |
| | Light Sweet Crude Oil |
| March 8 | New York Harbor Gasoline |
| March 9 | New York Harbor Gasoline |
| | Heating Oil |
| March 13 | Heating Oil |
| | New York Harbor Gasoline |
| March 14 | Light Sweet Crude Oil |
| | New York Harbor Gasoline |
| March 15 | New York Harbor Gasoline |
| | Light Sweet Crude Oil |
| March 16 | New York Harbor Gasoline |
| | Light Sweet Crude Oil |
| March 19 | New York Harbor Gasoline |
| | Light Sweet Crude Oil |
| | Heating Oil |
| March 20 | Heating Oil |
| March 21 | New York Harbor Gasoline |

257.    Defendants had the ability to cause and did intentionally cause an artificial price in futures contracts for Crude Oil, Heating Oil, and New York Harbor Gasoline on five of the days identified above:

| DATE | FUTURES CONTRACT |
|---|---|
| March 2, 2007 | New York Harbor Gasoline |
| March 16, 2007 | Light Sweet Crude Oil |
| March 16, 2007 | New York Harbor Gasoline |
| March 19, 2007 | Light Sweet Crude Oil |
| March 20, 2007 | Heating Oil |

## VI.
## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNTS 1-5:

### MANIPULATION AND/OR ATTEMPTED MANIPULATION OF THE PRICE OF CRUDE OIL, HEATING OIL AND NEW YORK HARBOR GASOLINE FUTURES BY DEFENDANTS OPTIVER, OPTIVER HOLDING, OPTIVER VOF, DOWSON, AND MEIJER

258.    Paragraphs 1 through 257 are re-alleged and incorporated herein by reference.

259.    Defendants Optiver, Dowson, and Meijer intended to affect the price of certain energy futures on at least five separate instances in March 2007 as follows:

   a.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 2, 2007;

   b.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April Crude Oil futures on March 16, 2007;

   c.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 16, 2007

    d.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April

Crude Oil futures on March 19, 2007;

    e.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April

Heating Oil futures on March 20, 2007;

260.    Defendants Optiver, Dowson, and Meijer possessed the ability to cause and did

cause the price of the Crude Oil, Heating Oil, and New York Harbor Gasoline as set forth in

paragraph 259 (a-e) to be artificial on at least the dates identified above. Accordingly,

Defendants Optiver, Dowson, and Meijer violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7

U.S.C. §§ 9, 13b, and 13(a)(2).

261.    Each and every overt act in furtherance of the intent to affect the price of certain

energy futures as identified above in paragraph 259 a-e, coupled with that intent, including but

not limited to every purchase, sale, bid, offer, telephone call, and e-mail is alleged herein as a

separate and distinct violation of Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9,

13b, and 13(a)(2).

262.    Optiver, Optiver Holding, and Optiver VOF are also liable for violating Sections

6(c), 6(d), and 9(a)(2) of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B),

by virtue of the acts of their officials, agents, or other persons acting within the scope of their

employment or office, including Defendants Dowson and Meijer.

### COUNTS 6-19:

### ATTEMPTED MANIPULATION OF THE PRICE OF CRUDE OIL, HEATING OIL AND NEW YORK HARBOR GASOLINE FUTURES BY DEFENDANTS OPTIVER, OPTIVER HOLDING, OPTIVER VOF, DOWSON, AND MEIJER

263.    Paragraphs 1 through 262 are re-alleged and incorporated herein by reference.

264.    Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it unlawful for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

265.    Defendants Optiver, Dowson, and Meijer intended to affect the price of certain energy futures on at least fourteen separate instances in March 2007 as follows:

   a. Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 6, 2007;

   b. Defendants Optiver, Dowson, and Meijer intended to affect the price of April Crude Oil futures on March 6, 2007;

   c. Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 8, 2007;

   d. Defendants Optiver, Dowson, and Meijer intended to affect the price of April Heating Oil futures on March 9, 2007;

   e. Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 9, 2007;

   f. Defendants Optiver, Dowson, and Meijer intended to affect the price of April Heating Oil futures on March 13, 2007;

   g. Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 13, 2007;

   h. Defendants Optiver, Dowson, and Meijer intended to affect the price of April Crude Oil futures on March 14, 2007;

i.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 14, 2007;

j.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April Crude Oil futures on March 15, 2007;

k.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 15, 2007;

l.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April Heating Oil futures on March 19, 2007;

m.  Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 19, 2007;

n.   Defendants Optiver, Dowson, and Meijer intended to affect the price of April New York Harbor Gasoline futures on March 21, 2007;

266.  Defendants Optiver, Dowson, and Meijer engaged in overt actions in furtherance of their intent to affect the price of certain energy futures during March 2007, as listed above in paragraph 265 a-n.

267.  By their conduct, Defendants Optiver, Dowson, and Meijer each violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

268.  Each and every overt action in furtherance of the intent to affect the price of Crude Oil, Heating Oil, and New York Harbor Gasoline futures contracts, coupled with that intent, including but not limited to every purchase, sale, bid, offer, telephone call, e-mail and instant message, is alleged herein as separate and distinct violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

269.    Optiver, Optiver Holding, and Optiver VOF are also liable for violating Sections

6(c), 6(d), and 9(a)(2) of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B),

by virtue of the acts of their officials, agents, or other persons acting within the scope of their

employment or office, including Defendants Dowson and Meijer.

### COUNTS 20-38:

### MANIPULATION AND/OR ATTEMPTED MANIPULATION OF THE PRICE OF CRUDE OIL, HEATING OIL AND NEW YORK HARBOR GASOLINE FUTURES BY DEFENDANTS DOWSON, MEIJER, AND VAN KEMPEN AS CONTROLLING PERSONS

270.    Paragraphs 1 through 269 are re-alleged and incorporated herein by reference.

271.    Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides: "Any person who directly

or indirectly, controls any person who has violated any provision of this Act or any of the rules,

regulations, or orders issued pursuant to this Act may be held liable for such violation in any

action brought by the Commission to the same extent as such controlled person."

272.    As set forth above in this Complaint, Defendants Dowson, Meijer, and van

Kempen individually and jointly, directly or indirectly controlled Defendant Optiver, which

committed multiple violations of the Act.

### COUNT 39:

### FALSE STATEMENT

273.    Paragraphs 1 through 272 are re-alleged and incorporated herein by reference.

274.    Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), makes it unlawful for any person

willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make

any false, fictitious, or fraudulent statements or representations, or make or use any false writing

or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to

a registered entity, board of trade, or futures association designated or registered under the Act acting in furtherance of its official duties under the Act.

275.    NYMEX is a board of trade as defined by Section 1a(2) of the Act, 7 U.S.C. § 1a(2).

276.    NYMEX was acting in furtherance of its official duties under the Act in reviewing Optiver's energy trading activity.

277.    On or about March 26, 2007, Optiver and van Kempen made material misrepresentations to NYMEX in the manner van Kempen described Optiver's trading strategy and profit motive, deliberately concealing from NYMEX Optiver's futures trading strategy and the profit motive from the Pre-Close futures trades.

278.    By their conduct Defendants Optiver and van Kempen violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

279.    Each and every instance of such conduct by Optiver and van Kempen is alleged herein as separate and distinct violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

280.    Optiver is also liable for violating Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), pursuant to Section 2(a)(1)(B) of the Act, by virtue of the acts of its official, agent or other person acting within the scope of his employment or office, including Defendant van Kempen.

## VII.
## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers

A.    Find Defendants liable for violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2);

B.    Find Optiver and van Kempen further liable for violating Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4);

C.    Enter an order of permanent injunction restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2);

D.    Enter an order of permanent injunction further restraining and enjoining van Kempen and Optiver and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4);

E.    Enter an order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from:

1.    trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2.    engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3.    soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4.    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to

be registered with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9) (2006);

     5.     entering into any commodity interest transactions for their own personal accounts, for any account in which they have a direct or indirect interest and/or having any commodity interests traded on their behalf; and/or

     6.     engaging in any business activities related to commodity interest trading;

F.     Enter an order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not to exceed the greater of $130,000 or triple the monetary gain to them for each violation of the Act, as described herein;

G.     Enter an order providing for such other and further equitable and ancillary relief as this Court may deem necessary and appropriate, including but not limited to restitution and disgorgement of ill-gotten gains and damages; and

H.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2).

## VIII.
## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: July 24, 2008

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF U.S.
COMMODITY FUTURES TRADING
COMMISSION

Stephen J. Obie (SO-5502)
Acting Director, Division of Enforcement
Vincent A. McGonagle
Senior Deputy Director
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5111
(202) 418-5519 (facsimile)
sobie@cftc.gov

Manal Sultan
Chief Trial Attorney
David Acevedo
Chief Trial Attorney
David W. MacGregor
Chief Trial Attorney
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9761
(646) 746-9940 (facsimile)
msultan@cftc.gov

Michael Berlowitz
David Oakland
R. Stephen Painter Jr.
Derek Shakabpa
Lara Turcik

\

# EXHIBIT B

**From:** Christopher Dowson
**Sent:** Friday, March 02, 2007 3:31 PM
**To:** Randal Meijer
**Cc:** Bastiaan van Kempen
**Subject:** TAS trading

I thought I would make you aware of what happened in the TAS's today.

Nick has made a tidy profit on his trading, close to $100k I expect. But I consider the way in which he did it, to be both deceitful, and reckless. It also makes a mockery of the risk/reward profile that we (Ferhad and I) are trying to achieve.

Please ask Nick and Jan-Jaap to explain themselves (and why they would hedge all their deltas before the settlement time), before we discuss this on Monday. They will tell you of course that they have noticed (after we told them), that when someone sells TAS's, the future often go down during the settlement. But, this is not always the case, so to do all your deltas before is pretty risky.

I can think of no reason that they would do this, other than the knowledge that we are going to hammer the futures.

To hedge against "market risk" we have traded oil futures in the opposite direction. This hedge cost $60k today. We also carefully consider the percentage of futures to trade before (these are the ones that make the profit) and the ones we need to do during in order to force the market down (the ones that cost money).

Since our colleagues in Amsterdam know that we are going to do the dirty work, they simply trade their futures before hand, and make a big profit on them.

Is this what you want?

OPTI-US 000001

\

# EXHIBIT C

| | |
|---|---|
| **From:** | Randal Meijer <RMeijer@Optiver.com> |
| **Sent:** | Wednesday, March 7, 2007 3:21 AM |
| **To:** | Christopher Dowson <CDowson@Optiver.com> |
| **Cc:** | Bastiaan van Kempen <BastiaanK@Optiver.com> |
| **Subject:** | RE: |

I talked to Jan-jaap and Nick about the TAS's .
They agreed to doing them from 1 spot being the US.

You can then raise your limits to 1000 per commodity (this equals app. 75 min per underlying right ?)

Please respect those limits.
When we gain experience and become more certain that we can influence VWAP I'm sure we can raise further.

They wondered though about some TAS's (e.g Natural Gas) , because you are not trading them.
They would like to experiment further on them.

-----Original Message-----
**From:** Christopher Dowson
**Sent:** Monday 05 March 2007 23:00
**To:** Randal Meijer
**Cc:** Bastiaan van Kempen
**Subject:**

Indices were really nice today. We've been a bit lucky with the spreads, but that is more the case that we now have a good opportunity (nasdaq 2+ points under Russell) without it hurting us too much. In total today we made just over half a million. More than 100% of that comes from day trading in Nasdaq and Russell.

Unfortunately today's Nasdaq trader is getting a bit old, and seemed prone to changing cut offs when I meant to be changing curves, and doing april cut off when I meant to do may. It has been quite a while since I've been sat behind the screen for the majority of the day, and you really can tell. Still, I managed to pick the high and low of the vols not too badly, so that made us a few dollars.

After all the excitement of Friday, we hardly had any position going into TAS settlement. We made $10k today, pretty much all from scalping.

Our crack position is also working nicely. Because the rolls were at such a good level historically, we did a few extra, and are small short crack in the first month. So even though we are overall long crack still, we made on position today despite the crack going down.

\

# EXHIBIT D

**From:** Christopher Dowson
**Sent:** Friday, March 09, 2007 6:01 PM
**To:** Randal Meijer
**Cc:** Bastiaan van Kempen

Terrible day in the indices. Position just didn't work, and we had a couple of really ugly delta rides in the Nasdaq. I think the total was close to -$100k.

Jordan made some money today, though I'm not going to claim it was anything to do with our conversation yesterday. I hope it's not that easy!

Ferhad's positions have cost a bit today. Only a $100k, but considering that they are not that big at the moment, this is a decent amount. He was a bit mad with me, for deliberately building a TAS position that would hurt his previous position. We certainly can be accused of front running ourselves though.

We made a total of $256k in the TAS's. $30k of this came from scalping TAS's. Our position at the end was long 1200 April HOT's, and 350 May HOT's, and short 900 April RBT's, and 320 May RBT's. This gave us a reasonably flat market delta. Starting at 1.20 we did 500 HO's against 500 RBT's before the settlement began, keeping the positions balanced against each other. This worked very nicely, since even thought during this time there was a reasonable down move, we came out flat in the gasolines that we had to buy, and made all our money in the HO's that we were short.

We noticed that it is not as easy to bully the market as it has been previously when it was "obvious" that the TAS's were bid/offered in a certain direction.

OPTI-US 000002

\

# EXHIBIT E

**From:** Randal Meijer
**Sent:** Tuesday, March 13, 2007 9:32 AM
**To:** Christopher Dowson
**Cc:** Bastiaan van Kempen
**Subject:** RE:

Well the 50/250 limit holds , so a bit over 4000 you can do.

> -----Original Message-----
> **From:** Christopher Dowson
> **Sent:** Tuesday 13 March 2007 13:48
> **To:** Randal Meijer
> **Subject:** RE:
>
> We quote the crude everyday.  But I am very wary about deliberately building up a big position there.  To be able to move the crude, we would need a position of substantial size.  I would think of the order 5000 contracts.  Are you willing to do it that big already?
>
> > -----Original Message-----
> > **From:** Randal Meijer
> > **Sent:** Tuesday 13 March 2007 01:54
> > **To:** Christopher Dowson
> > **Cc:** Bastiaan van Kempen
> > **Subject:** RE:
> >
> > Have you tried the tas's in the crude already ?
> >
> > Yesterday we made 42k on 1400 apr and 1000 mays (25 % prebuy) in the minute marker brent
> >
> > > -----Original Message-----

OPTI-US 000003

\

# EXHIBIT F

**From:**   Christopher Dowson
**Sent:**   Thursday, March 15, 2007 8:40 AM
**To:**     Nicholas Stepanek
**Subject:** RE: spreads

Hey Nick,

I did think about those stock spreads last week, but with our limited manpower, and so many other things going on, I decided not to pursue it. We did start to trade some index future spreads again during that time though.

Have you done any stock spread trades recently?

The gasoline was printed a lot against us yesterday, but we still made 270, or so.

6000 crudes is over the limit that I agreed with Johann, but next time someone pays 1 tick over (i.e. genuine interest) for some size, I am, going to do 4000, and see how our power is.

I don't expect any problems regarding market manipulation. I think we are still just providing liquidity, but you never know. Ferhad and I were looking at the day graphs yesterday, and if you compare the amount we moved the rbob, compared to normal daily movement, then it is not significant.

As for the brent-wti, I completely agree with all your comments. I think it is a much more risky trade than I would normally like, but given the level is pretty extreme I decided to do a trade. I will just reduce the position to zero today.

-----Original Message-----
**From:** Nicholas Stepanek
**Sent:** Thursday 15 March 2007 06:09
**To:** Christopher Dowson
**Subject:** spreads

Hi Chris,
How's it going? I was wondering you had looked into trading any stock spreads with the increased volatility. I find that I can make money when the VIX is over 17 or so. I gave you that list a few months ago. Something to think about. Also, TAS going great. Glad it's going so well for us. The minute marker is a bit tough but we're averaging 20 or so. I see you traded yesterday for no credit in the gasoline and made 400 (maybe more) or so?. It seems we can even create a position for a loss and make money. Have you thought about just doing the crude massively big? I think with 6000 or so, you can even move that one, like we're doing with the minute marker. Obviously the gasoline is just a great product for it. Could this be considered market manipulation? As long as we don't trade against ourselves, everything seems above board, but I still think the exchange might start to look into it. Last thing, the brent-wti position you put on seemed a little strange to me. This is what happened to us a few months ago with the heating oil curve steepening. You just get forced out and there's nothing you can do. We roll everything really early to avoid this, and thus we have limited our losses in this spread. I admit this is quite extreme, but anything is possible in the short-term. The McKee refinery outage means the market is being flooded with spot crude along with excess Canadian crude flowing south, accompanied with Iran tensions and the Nigeria situation is pushing the spread to this extreme. Not sure your plans, but the brent will get extremely illiquid throughout today and I don't really have a firm handle on how the cash settlement price is set (based upon 21-day brent forward deals throughout today).
Regards,
Nick

OPTI-US 000004

\

# EXHIBIT G

**From:** Christopher Dowson

**Sent:** Thursday, March 15, 2007 5:29 PM

**To:** Randal Meijer

**Cc:** Bastiaan van Kempen

Some interesting things today. Once again, not necessarily something to be proud of, but definitely interesting.

We (or essentially I) have had a WTI/brent spread for a couple of weeks. We had said normally that we wouldn't want to trade it up to expiry, but since it was so "extreme", we did. Anyway the thing became quite ugly, meaning at the worst point of yesterday, we were down almost $900k over the two weeks. At the close yesterday we were down about $700k.

My idea was that since the level was interesting, we would put on the spread, and if it didn't come our way we would take the loss, and hack it out on Wednesday/Thursday. We have done the same with the Rbob/HO spread, which fortunately has come back, and made $250k. The levels in both by the way are historically very high.

Today because the liquidity, was not so good, by the time the US was open, we were not in a very nice position. Since they are both cash settled, Ferhad checked the expiration procedure to see if letting it expire was a possibility. Originally this was never the intention, but we should have looked into it earlier.

We now think that the brent, expires gradually over the day today. This would mean that your spread essentially becomes sec deltas in the WTI, during the day. By the time we realized that, we had already taken off 200, of our 700 futures. As it turned out at pretty nice levels. For the remainder, we sold WTI futures, and we will let the brents expire. We will see the settlement price tomorrow morning.

So far it is a terrible story, of trading perhaps too big, and not researching properly. Now for the interesting part. If our understanding of the expiration procedure is correct, then since the expiration price is determined gradually over the day, the brent should tend towards a certain level. And it did seem to do this. There were however two strange things. Firstly when it was 97% expired, the future appeared to still move together with the crude to a certain extent. (something like delta 25). And secondly right at the end, in the last couple of minutes, when it should have a delta close to zero, the future was all of a sudden bid up by 40 cents.

Now because we didn't have access to all the information necessary to determine the expiration price, I cannot say which of the things we should have traded on. But what is certain, is that there are good trading opportunities if we can access this information, and reasonable one even if we can't. Presently both Nick and Ferhad are further investigating.

Elsewhere, we traded the gasoil TAS that is at the same time as the minute marker. Despite having a position of 2000 futures we didn't have enough power. We made $1k there. In the main event, we had a good size crude position. 2800 futures. Since we are close to expiration, the future is becoming more illiquid, which makes influencing it easier. Mark beat vwap by just over 5 ticks, making $140k, plus printing one tick in our favour another $28k. We also had a gasoline position of 700 (500+200), which we beat by 20 ticks in the mays, and broke even in the aprils. Total score just over $220k.

Lee traded google again today. p/l $12k. and he is only doing cboe at the moment, because the hidden quote script on the ise machine was so weird.

Indices is also not a pretty picture. Arwin is down over $200k. This comes from losing on long premium. So a combination of theta and the vols coming down.

The rest have been aggressively building off positions, which has gone well, but they haven't made anything today. I suppose this is to be expected, since we let the strike positions get bigger than usual recently because of the amount of trading. I am actually pretty happy at how much they have tidied it up today.

At least Bas is making money with his trading!

OPTI-US 000005

# EXHIBIT H

ERO-270-Optiver-000005

| | |
|---|---|
| **From:** | Ferhad Mekic <FerhadMekic@Optiver.com> |
| **Sent:** | Monday, March 19, 2007 1:08 PM |
| **To:** | Randal Meijer <RMeijer@Optiver.com> |
| **Subject:** | RE: |

We are bidding even in all the oil products on the NYMEX (Oil 3000, HO 2500 and Gasoline 2500). This gives us the best chance of getting some big positions without trading against other marketmakers, so now it is up to the market to sell to us.

I will let you know what happened.

Regards,

Ferhad

PS. I am responsible, with Chris of course for trading the TAS contracts in other weeks as well.

-----Original Message-----
**From:** Randal Meijer
**Sent:** Monday, March 19, 2007 11:22 AM
**To:** Ferhad Mekic
**Cc:** Bastiaan van Kempen; Christopher Dowson
**Subject:**

Ferhad,

I assume you are responsible for trading the TAS's this week.

I also assume you will be trading them big enough even when Chris is away.

Can you e-mail me daily with the positions you were having , what happened and the results ?

Regards,

Randal

\

# EXHIBIT I

| From: | Ferhad Mekic <FerhadMekic@Optiver.com> |
|---|---|
| Sent: | Wednesday, March 21, 2007 8:55 AM |
| To: | Christopher Dowson <CDowson@Optiver.com>; Bastiaan van Kempen <BastiaanK@Optiver.com> |
| Subject: | FW: Monday TAS trading |

-----Original Message-----
**From:** Ferhad Mekic
**Sent:** Monday, March 19, 2007 2:43 PM
**To:** Randal Meijer
**Subject:** Monday TAS trading

| Product | Position | Deltavalue | Profit |
|---|---|---|---|
| Crude April (exp tomorrow) | 2234 | 127 000 000 | $ 221 000 |
| Heating oil April (exp two weeks) + small May | 798 | 57 000 000 | $ 16 000 |
| Gasoline April (exp two weeks) | 929 | 76 000 000 | $ 3 000 |

| | | TOTAL | |
|---|---|---|---|
| | | | $ 240 000 |

Randal,

As you can see the crudes went really well. We had lots of influence due to the expiration tomorrow.

The gasoline did not go well because we did not stay on schedule.

The heating oil did not have major influence and there were some buyers at the close so the VWAP was not low compared to the lots we sold earlier. We encountered this on Friday so I would say that people are either front-running us in the future with or without TAS contracts, or are trading TAS contracts in the opposite direction to us. My aim now is to trade almost all the TAS contracts in the front month. We will be even bid at one over for 2500.

Regards,

Ferhad

\

# EXHIBIT J

**ERO-270-Optiver-000007**

| From: | Ferhad Mekic <FerhadMekic@Optiver.com> |
|-------|------------------------------------------|
| Sent: | Wednesday, March 21, 2007 8:55 AM |
| To: | Christopher Dowson <CDowson@Optiver.com>; Bastiaan van Kempen <BastiaanK@Optiver.com> |
| Subject: | Tuesday TAS trading |

-----Original Message-----
**From:** Ferhad Mekic
**Sent:** Tuesday, March 20, 2007 2:45 PM
**To:** Randal Meijer
**Subject:** RE: Monday TAS trading

| Product | Position | Deltavalue | Profit |
|---------|----------|------------|--------|
| Crude May (exp in a month) | 2439 | 145 000 000 | $ 177 000 |
| Heating oil April (exp two weeks) + small May | 1346 | 94 000 000 | $ 173 000 |
| Gasoline April (exp two weeks) | 299 | 24 000 000 | $ 5 000 |
| Brent (exp in a month) | 1764 | 106 000 000 | $ 121 000 |
| | | **TOTAL** | **$ 476 000** |

Randal,

Today we had a textbook execution in the crude, heating oil and Brent. We sold 20-30% beforehand, the market went down afterwards so we hedged the TAS contracts with quite some edge.

The gasoline position was of a medium size, so difficult to hedge and also the VWAP printed against us.

By quoting the heating oil and gasoline TAS contracts for substantial size we ended up doing 80-90% of the volume in the front month and so kept others out. Tomorrow we are going to be more aggressive in the Brent contract.

Regards,

Ferhad

# EXHIBIT K

**From:**     Donnelly, Kristine [Kristine.Donnelly@FortisClearingAmericas.com]
**Sent:**     Wednesday, March 21, 2007 1:36 PM
**To:**       Bastiaan van Kempen
**Subject:** from Russell Levens...

## Notice to Members

Notice No. 548
10/19/2006

**Compliance Advisory: Disruptive Use of TAS and MO Trading Practices**

Members are reminded that misuse of TAS or MO trades to acquire a position in order to unfairly effect or attempt to unfairly effect a settlement price subject the member and/or the customer to disciplinary action for any of a number of rule violations including but not limited to attempted price manipulation, disruptive trading, wash trading, or conduct substantially detrimental to the exchange. Investigation of suspected manipulative pricing involving TAS will focus on the percentage of TAS positions acquired by a trader, group or traders or customer(s) and whether the offset of that position during the close was disruptive, collusive, and/or caused or attempted to cause aberrant price movement in the close.

Should you have any questions or require any further information, please contact exchangeinfo@nymex.com

```
Kristine Donnelly
Chief Compliance Officer
Fortis Clearing Americas, LLC
Telephone: +1 312 604-8020
Fax: +1 312 604-8242
Email: kristine.donnelly@fortisclearingamericas.com
```

OPTI-US 000006